IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

In re:

**TARA RETAIL GROUP, LLC**

       Debtor,                                         Chapter 11

                                                    Case No. 17-00057

### DECLARATION OF WILLIAM A. ABRUZZINO, MANAGING MEMBER OF DEBTOR TARA RETAIL GROUP, LLC, IN SUPPORT OF PLEADINGS OF DEBTOR AND DEBTOR IN POSSESSION

I, William A. Abruzzino, hereby make this declaration under penalty of perjury:

1. I am a Manager and the President of Tara Retail Group, LLC ("Tara" or the "Company"), the debtor and debtor in possession in the above-captioned bankruptcy case. I have held this position at Tara since the inception of the Company on October 2, 2012.

2. On January 24, 2017 (Petition Date"), Tara filed voluntary petition for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code").

3. Tara continues to manage and operate its business and property as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or committee of creditors has been appointed in this case.

4. Tara is a Georgia limited liability company. Until December 1, 2016, Tara's principal place of business was 205 Marion Square, Fairmont, West Virginia, 26554. Currently, Tara's principal place of business is P.O. Box 190, Bonita Springs, FL, 34133-0190.

5. Tara owns a certain real estate development generally known as the Elkview Crossings Shopping Mall, Elkview, West Virginia ("Shopping Mall"). The tenants at the Shopping Mall include K-Mart, Kroger and numerous other retailers. The mall has been a

valuable retail center along Interstate 79 and of great benefit to the people of Elkview and surrounding areas.

6.      Tara is a single purpose entity. The rents from the Shopping Center are Tara's sole source of revenue.

## EVENTS THAT LED TO THE BANKRUPTCY FILING

7.      On or about September 17, 2013, UBS Real Estate Securities, Inc. ("Original Lender") originated a $13,650,000 loan ("Loan") to Tara.  As evidence of the Loan, Tara executed a Promissory Note dated September 17, 2013 in the original principal amount of $13,650,000.00 in favor of Original Lender (the "Note") along with that certain Loan Agreement dated September 17, 2013 between Tara and Original Lender (the "Loan Agreement"). The Loan is secured by a deed of trust on the Shopping Center property. The Original Lender subsequently assigned all its rights under the Loan to U.S. Bank National Association, as trustee for the benefit of the holders of "COMM 2013-CCRE12 Mortgage Trust Commercial Mortgage Pass-through Certificates" ("Lender").  Upon information and belief, the Loan was packaged together with numerous other commercial loans which are all now held by Lender as trustee for the benefit of an unknown and unidentified group of investors.

8.      Under the Loan Agreement, payments became due starting on November 6, 2013, and continuing on the 6th day of each ensuing month.

9.      The Loan is "non-recourse" with exceptions which are outlined in Section 11.22 of the Loan Agreement.  One of the exceptions is the filing of a bankruptcy petition by Tara. Thus, the Lender now has recourse to my wife and me, as the guarantors under the Loan.

10.     Under the Deed of Trust, Tara conveyed certain real estate and personal property, described more specifically in the Deed of Trust, known as the Crossings Mall located at 223

2

Crossings Mall Road, Elkview, West Virginia 25071 (the "Property") to Trustee for the benefit of Original Lender. The Property contains many retail tenants such as K-mart, Kroger and McDonald's. The Property is the only large retail center within a substantial radius around Elkview, West Virginia and is a vital commercial center for residents in the area. A copy of the most recent rent roll prior to June 23, 2016, dated May 3, 2016 is attached as **Exhibit A.** The rent roll reflected monthly base rent of $142,278.30 from 23 active tenants. The two largest tenants are K-Mart and Kroger, which occupy 40.02% and 15.47% of the Property respectively.

11. Prior to June 23, 2016, Tara's monthly debt service under the Loan Agreement was $108,366.03, excluding late charges. A copy of the last Commercial Mortgage Servicing Billing Statement, dated June 6, 2016, is attached hereto as **Exhibit B.**

12. Under the Loan Agreement, tenants of the Shopping Mall were required to remit payments directly to Lender's lockbox. Copies of the bank statements from Lender's lockbox are attached hereto as **Exhibit C.** A spreadsheet summarizing the deposits into Lender's lockbox, the required monthly payments and what should be the running balance in the lockbox through November, 2016, is attached hereto as **Exhibit D.** Despite the fact that more than enough money was being paid into Lender's lockbox, for some reason Lender was charging late fees of over $5,000/month to Tara, as shown on **Exhibit B**.

13. On June 23, 2016, thunderstorms brought torrential rain to much of southern West Virginia, resulting in accumulations of up to 10 in (250 mm) in 12-24 hours. According to meteorologists at the National Weather Service, this rainfall qualifies as a 1,000 year event. The tremendous rainfall produced widespread and destructive flash floods in the state. The Elk River rose to an all-time high of 33.37 ft (10.17 m), surpassing the previous record of 32 ft (9.8 m) set in 1888. In Kanawha County, the flood waters of Little Sandy Creek, a tributary of the Elk River, washed away the culvert and bridge connecting the Shopping Mall to the public

road, stranding approximately 500 people for nearly 24 hours. At least six people died in Kanawha County.[1]

14. In January, 2016, Tara observed structural defects with the culvert, and made a pre-flood request for a release of capital expenditure funds under the loan agreement to allow for repairs to be made to the culvert providing access to the property. A copy of the letter making this request to Lender, through its servicer, is attached hereto as **Exhibit E.** Lender, through its servicer, denied this request.[2]

15. After the June 23rd, 2016 flood, there was no suitable public access to Shopping Mall. Immediately after June 23, Tara began to contact Lender's servicer, to address the fact that the Shopping Center was now cutoff from public access and thus closed. Neither Lender nor its Servicer responded for more than a month.

16. On July 28, 2016, counsel for Tara wrote a letter to Lender's servicer, summarizing the crisis facing the Shopping Center, Tara, and Lender itself. A copy of this Letter is attached hereto as **Exhibit F.**

17. After the July 28, 2016 letter, upon information and belief, Lender's servicer resigned and LNR Partners, LLC, was appointed by Lender as special servicer.

18. During the period after the flood, I undertook efforts to re-construct the bridge and culvert to restore access to the Shopping Mall, including obtaining a permit to rebuild the bridge, and arranging for financing to fund construction. After LNR was appointed special servicer, we undertook negotiations with Lender through LNR in August- September, 2016.

---

[1] *See* Wikipedia Article, 2016 West Virginia Flood, https://en.wikipedia.org/wiki/2016_West_Virginia_flood.

[2] Upon information and belief, Lender's position is that Tara had an obligation under the Loan Agreement to prefund the repairs, and then seek reimbursement from the capital reserve account. However, Tara is a single purpose entity, all of whose revenue is derived from the rents from the Shopping Mall, and all of those rents were paid into Lender's lockbox. Thus, Tara had no ability to prefund the cost of needed capital repairs.

During these negotiations, Tara proposed to rebuild the bridge using the capital expenditure funds then being held by Lender, which Tara understood to be approximately $300,000.00 with the balance of the repair cost (approximately $500,000.00) to be injected as new capital by me, as Tara's owner, through financing I had arranged.

19.     To support this injection of new capital, Tara and I asked Lender through LNR to agree to add the missed payments under the Loan, to the end of the loan term.  During these negotiations in approximately August-September, 2016, Lender through LNR appeared to be agreeable to allowing the use of capital expenditure funds being held by Lender to partially underwrite construction to restore access to the mall property.  However, Lender though LNR refused Tara's request to add the missed loan payments to the end of the loan term, instead insisting that Tara must make up the missed loan payments over the ensuing 12 months.  As the rents from the Shopping Mall appeared to be insufficient to amortize the missed payments over 12 months, Tara's negotiations with Lender to rebuild bridge broke down.

20.     After the flood, upon information and belief, the tenants at the Shopping Mall ceased making lease payments into Lender's lockbox.  When negotiations with Lender broke down, Lender thereafter declared Tara in default on the Loan, accelerated the balance owed, and demanded immediate payment in full from Tara.

21.     On September 28, 2016, Lender filed a lawsuit in the Southern District of West Virginia against Tara, alleging default under the Loan between Tara and Lender and seeking the appointment of a receiver.  *See* Civil Action No. 16-cv-09232 (the "Civil Action.").

22.      On December 1, 2016, Judge Johnston scheduled a hearing and settlement meeting on Lender's request for a receiver in the Civil Action.  However, by December, my financial position had deteriorated, in substantial part due to the fact that the Elkview La Quinta

Inn, owned by Emerald Grande, LLC, has also been closed since June 23 of last year, and the financing that I had arranged in August was no longer available. After negotiations through the court-led mediation failed, Judge Johnston held a hearing on Lender's motion for appointment of a receiver, and thereafter granted Lender's request, appointing a receiver by order entered on December 23, 2016.

23. By notice dated December 28, 2016, served almost immediately after the order appointing the receiver was entered, the Lender initiated foreclosure on the Shopping Center pursuant to the terms of the deed of trust. The foreclosure was scheduled for Tuesday, January 24, 2017, at 1:30 p.m., at the front door of the Kanawha County Courthouse in Charleston, West Virginia.

24. Because of the impending foreclosure on the Shopping Center, Tara was forced to file for protection under Chapter 11 of the Bankruptcy Code.

25. Tara understands that the receiver has obtained construction bids and is working to re-store access to the Shopping Mall, but as of the petition date, no contract has been awarded and thus construction to rebuild the bridge has not started at the site.

26. Thus, as of the petition date, access has not been restored and the Shopping Center remains idle. Nonetheless, when the Shopping Center is restored to operation, there is good cause to believe that Tara will be able to propose a plan to repay its debts, as the pre-flood monthly rent roll exceeded Tara's monthly debt service by $33,912.27.

27. Tara' financial distress is a direct consequence of the complications from the June, 2016 flooding, not from an inability to pay its debts as they became due.

28. According to the letter accompanying Lender's notice of foreclosure, the payoff for the Loan is $17,000,977.18 as of December 28, 2016, which includes a defeasance penalty of

approximately $3,550,000. However, if Tara proposes a plan to reinstate payments to Lender, the defeasance penalty should be eliminated from Lender's claim.

29. Upon information and belief, Lender is charging Tara the default interest at the rate of 11.5% per annum and is assessing Tara other late fees and assessments in addition to the defeasance penalty, including assessing default interest on Tara for all of the receiver's costs and expenses, as well as the costs of constructing the new access way to the Shopping Center. I am currently exploring post-petition financing under the Bankruptcy Code, at a lower interest rate than the default interest rate being charged by Lender.

30. Restoration of access to the Shopping Center is still several months away. Nevertheless, Tara's financial problems will be resolved once access is restored and the Shopping Center can resume normal operations, as there is reason to believe that the monthly rent role will substantially exceed debt service on the Loan.

31. On January 11, 2017, Emerald Grande, LLC ("EG") , an entity which owns and operates the La Quinta Inn and Suites hotel located adjacent to the Shopping Center filed a petition for relief under Chapter 11 of the Bankruptcy Code. I am the managing member of EG, though EG is technically not an affiliate of Tara. Restoration of access to the Shopping Center will also substantially benefit EG.

I, William A. Abruzzino, the undersigned Manager and President of Tara Retail Group, LLC, declare under penalty of perjury that the foregoing is true and correct.

Dated: January 27, 2017

                                              **/s/ William A. Abruzzino**
                                              **William A. Abruzzino**
                                              **Manager and President of Tara Retail**
                                               **Group, LLC**