# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| In re: ) | |
| ) | |
| TARA RETAIL GROUP, LLC ) | |
| *dba* Tara Hotel Group, LLC, ) | Case No. 17-bk-57 |
| ) | |
| Debtor. ) | Chapter 11 |
| ) | |

## MEMORANDUM OPINION

Pending before the court are competing proposed Chapter 11 plans: one filed by Tara Retail Group, LLC (the "Debtor") to reorganize its financial affairs and the other filed by Comm 2013-CCRE12 Crossings Mall Road, LLC ("Comm2013"), the Debtor's principal creditor and mortgagee, seeking to liquidate the Debtor's property. Also pending is Comm2013's motion to exclude certain evidence from the court's consideration in conjunction with its determination regarding which proposed plan, if either, it should confirm.

For the reasons stated herein, the court will enter a separate order denying confirmation to Comm2013 and confirming the Debtor's proposed Chapter 11 plan of reorganization.

## I. BACKGROUND

The Debtor owns The Crossings Mall in Elkview, West Virginia. It is a multi-tenant commercial property encompassing about 200,000 square feet. Public access to it is limited to a single bridge—formerly spanning a culvert—over Little Sandy Creek. The Debtor purchased The Crossings Mall in 2013 after the then-owner, Interstate Properties, LLC, filed a Chapter 11 bankruptcy in the Northern District of Georgia. To finance its purchase of The Crossings Mall, the Debtor obtained a loan from UBS Real Estate Securities, Inc. ("UBS"). UBS agreed to finance the Debtor's $13,650,000 purchase on certain conditions. In that regard, the Debtor executed a Loan Agreement and Promissory Note, the repayment of which the Debtor secured by executing a Deed of Trust and an Assignment of Leases and Rents (the "ALR"). Additionally, the Debtor executed a Cash Management Agreement and Management Agreement. The documents

governing the relationship between UBS and the Debtor include requirements that the Debtor be an affiliate or wholly-owned subsidiary of Interstate Properties' principal, Mr. Abruzzino, and be a single-purpose entity prohibited from engaging in any business other than owning The Crossings Mall.  UBS subsequently assigned the loan to U.S. Bank N.A., as trustee for Comm2013 CCRE 12 Commercial Mortgage Pass Through Certificates.  In 2017, that entity assigned the loan to Comm2013.  Wells Fargo services the loan and administers certain escrow accounts consistent with its role in that regard.

Among other subaccounts created by the Loan Agreement, Wells Fargo maintains an account for Capital Expenditures, which the Loan Agreement defines as "the amounts expended for items required to be capitalized under GAAP (including expenditures for replacements, building improvements, major repairs, alterations, tenant improvements and leasing commissions)."  Specifically, the Debtor was to deposit $3,493.62 monthly into the Capital Expenditure Account, and § 6.4.2 of the Loan Agreement controls the release of those funds.  It provides, among other things, that the Defendants "disburse to [the Debtor] the Capital Expenditure Funds upon satisfaction by [the Debtor]" of various conditions.  Among those conditions is that the Defendants "shall have received an Officer's Certificate (A) stating that all items to be funded by the requested disbursement are Capital Expenditures, [and] (B) stating that all Capital Expenditures to be funded by the requested disbursement have been completed in a good and workmanlike manner . . . ."

In January 2016, the Debtor's management company obtained a quote for $9,200 to "replace a drop inlet culvert at the entrance of the Crossings Mall in Elkview."  In a subsequent email to Wells Fargo, the Debtor's property manager related that if this matter "is not resolved immediately the only entrance to the center could collapse."  Notably, the Debtor had not yet effectuated the repair at the time its property manager requested the Capital Expenditure Funds.  It was apparently unable to make the repair without use of the Capital Expenditure Funds.  On January 22, 2016, Wells Fargo responded that it first wanted an explanation of why rent rolls were below the expected receipts. Collected rents were between $89,000 and $96,000 per month, and

2

the scheduled rent was $128,420.80.  Ultimately, Wells Fargo did not release the requested funds for the culvert repair.[1]

In June 2016, significant rainfall caused debris and water to accumulate at the culvert bridge providing access to The Crossings Mall.  Ultimately, Little Sandy Creek overflowed its banks and flooded bordering properties before washing away the culvert bridge.  After the flood, the Debtor's tenants were unable to operate, and rents eventually stopped.  The Debtor was therefore unable to service its debt to Comm2013, which ultimately filed a civil action against the Debtor in the District Court for the Southern District of West Virginia, in which it sought the appointment of a receiver.  That precipitated the Debtor's bankruptcy case.  During this case, the Debtor successfully restored access to its property with the construction of a bridge spanning Little Sandy Creek.  To fund the construction, it obtained post-petition financing from the entities employed to build the bridge who, in turn, obtained super-priority over Comm2013's secured interest in certain rents payable from Kroger and Kmart.  They agreed to undertake the construction with no payment from the Debtor until tenants resumed operating.  Specifically, the Debtor agreed to repay the post-petition financing with rents generated from Kroger and Kmart.  Notably, the Debtor also recently obtained a favorable resolution of its claim against Emerald Grande, LLC, resulting in a partial reimbursement of the cost of the bridge construction.

Both the Debtor and Comm2013 solicited acceptances of their respective plans.  Ultimately, the overwhelming majority of claimants, including the many individuals affected by the flood and lack of access to The Crossings Mall, voted to accept the Debtor's proposed plan.  Specifically, sixty-eight of seventy individuals in Class Three, and the three tenant claimants with allowed claims, which voted in Class Two, accepted the Debtor's plan.  Comm2013 itself is the only entity with an allowed claim that voted to accept its plan.  In May 2019, the court convened a confirmation hearing over two nonconsecutive days.  In that regard, the court heard testimony from several witnesses, including representatives from the Debtor and Comm2013 and experts that opined as to whether the Debtor's proposed plan is feasible and whether the Debtor proposed an adequate interest rate for the repayment of Comm2013's allowed secured claim.  At the conclusion of the confirmation hearing, the parties agreed to submit post-trial argument in the form of briefs

---

[1] To be clear, the record does not reflect that Wells Fargo denied the request.  Rather, it simply responded seeking certain information regarding the rent being paid by the Debtor's tenants.

and proposed findings of fact and conclusions of law. Also post-trial, Comm2013 filed its motion to exclude from the court's consideration certain evidence adduced at trial regarding communications related to Comm2013's loan agreement with the Debtor. By separate order entered contemporaneously herewith, the court denies Comm2013's request in that regard.

## II. ANALYSIS

Pending before the court are two proposed Chapter 11 plans. The Debtor seeks to reorganize its financial affairs and continue operating The Crossings Mall into the future. In that regard, it proposes to treat Comm2013's Allowed Claim with 120 monthly payments of $86,000 and additional annual payments of 50% of the Annual Excess Available Cash, culminating in a balloon payment of all remaining amounts due on the Allowed Claim. The Debtor intends to perform in that regard pursuant to a New Promissory Note and New Loan Agreement, proposing the cancellation of the existing Promissory Note and Loan Agreement. Regarding General Unsecured Claims, the Debtor proposes to pay those that are allowed in full over 144 months with interest at the Federal Judgment Interest Rate. Comm2013 contends that the Debtor's plan is unconfirmable for several reasons. Specifically, it contends that: 1) the Debtor failed to properly classify its claim; 2) the Debtor gerrymandered classes of unsecured claims to obtain at least one consenting, impaired class; 3) the Debtor's proposed plan is not feasible; and 4) the Debtor's proposed treatment of it is not fair and equitable under § 1129(b) of the Bankruptcy Code, including withholding payments to it, not compensating it with an adequate interest rate, and negatively amortizing its claim.

Comm2013 seeks to liquidate The Crossings Mall, pay the bankruptcy estate's administrative claims, and compensate unsecured creditors with a cash infusion into the estate. Specifically regarding general unsecured claims treated in Class 4 of Comm2013's plan, Comm2013 proposes to pay all unsecured claims, at least those filed as of November 1, 2017, in full. The Debtor contends that the court cannot confirm Comm2013's proposed Chapter 11 plan based upon the following: (1) Comm2013 is not authorized by its Pooling and Servicing Agreement ("PSA") to file a liquidating Chapter 11 plan; (2) Comm2013 has a conflict of interest disqualifying its plan under § 1129(a)(3) of the Bankruptcy Code; and (3) Comm2013 is an insider such that its sole vote in favor of its proposed Chapter 11 plan cannot be counted in determining whether it obtained acceptance of its plan by an unimpaired class of claims as required by § 1129(a)(8).

4

**A.  Relevant Confirmation Requirements**

Section 1129(a) of the Bankruptcy Code sets forth the requirements for confirmation of a plan under Chapter 11.  At issue here are the requirements enumerated in paragraphs (3), (8), (10), and (11) of § 1129(a), as well as § 1129(b).  Section 1129(a)(3) mandates that "[t]he plan [be] proposed in good faith and not by any means forbidden by law."  Courts generally view this requirement simply as one of good faith.  "The overriding standard for good faith within the meaning of [§] 1129(a)(3) is whether 'there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.'"  *In re Walker*, 165 B.R. 994, 1001 (E.D. Va. 1994) (quoting *Hanson v. First Bank of South Dakota, N.A.*, 828 F.2d 1310, 1315 (8th Cir. 1987)); *see In re Bate Land & Timber, LLC*, 523 B.R. 483, 492 (Bankr. E.D.N.C. 2015) (citing *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984)) (same).  In that regard, the court looks to the totality of the circumstances surrounding the proposed plan.  *In re Bate Land & Timber*, 523 B.R. at 493.  Regarding the requirement of § 1129(a)(3) that a plan not be "proposed by any means forbidden by law," a leading treatise notes that most courts focus on a proposed plan's implementation and not strictly whether its proposal is prohibited by law.  7 *Collier on Bankruptcy* ¶ 1129.02[3][b] (Richard Levin & Henry J. Sommer eds., 16th ed.).  Interpreting an identical provision in Chapter 13—§ 1325(a)(3)—the Fourth Circuit opined that "the basic inquiry should be whether or not under the circumstances of the case there has been an abuse of the provisions, purpose, or spirit of [the Chapter] in the proposal or plan . . . ."  *Deans v. O'Donnell (In re Deans)*, 692 F.2d 968, 972 (4th Cir. 1982) (citations omitted).

Section 1129(a)(8) of the Bankruptcy Code provides, in relevant part, that the court confirm a proposed plan only if each impaired class of claims or interests accepts the plan.  Notably, however, "§ 1129(a)(8) is the only condition precedent which is not absolutely necessary for confirmation."  7 *Collier on Bankruptcy* ¶ 1129.02[8] (Richard Levin & Henry J. Sommer eds., 16th ed.).  Rather, it provides a pathway to confirmation commonly known as consensual confirmation.  Otherwise, the court looks to § 1129(b), which provides that "the court . . . shall confirm the plan notwithstanding the requirements of [§ 1129(a)(8)] if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  11 U.S.C. § 1129(b)(1).  In pertinent part,

5

the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that holders of such claims retain the liens securing such claims . . . to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

11 U.S.C. § 1129(b)(2).

In *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), the Supreme Court addressed the requirement that a debtor compensate a secured creditor with deferred cash payments of a value totaling at least the value of allowed amount of the secured claim as of the effective date of the proposed plan. There, the Court was tasked with determining which interest rate calculation Congress intended debtors to use when providing secured creditors with the "value, as of the effective date of the plan" at least equal to the amount of the creditor's allowed claim.[2] *See Till*, 541 U.S. at 474. The court ultimately "reject[ed] the coerced loan, presumptive contract rate, and cost of funds approaches," *id*. at 477, and held that the "prime-plus or formula rate best comports with the purposes of the Bankruptcy Code." *Id.* at 479. It reached its decision in that regard, at least in part, because "the formula approach entails a straightforward, familiar, and objective inquiry, and minimizes the need for potentially costly additional evidentiary proceedings." *Id*. In selecting the formula approach, the Court instructed that the goal of cramdown provisions like the one at issue here is to "ensure than an objective economic analysis would suggest the debtor's interest payments will adequately compensate . . . creditors for the time value of their money and the risk of default." *Till*, 541 U.S. at 477. Additionally, the Court noted that the formula approach "depends only on the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or its prior interactions with the debtor." *Id*. at 489.

Importantly, the formula approach "begins by looking to the national prime rate . . . which reflects the financial market's estimate of the amount a commercial bank should charge a

---

[2] *Till* arose in the context of a Chapter 13 plan and the requirement of § 1325(a)(5)(B) of the Bankruptcy Code. Although not factually analogous to the case before the court, the relevant statutory language—§ 1129(b)(2)(A)(i)(II)—is substantially similar.

6

creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default." *Id*. at 479. From there, the court must adjust the prime rate "[b]ecause bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers . . . ." *Id*. Notably, however, the Court "d[id] not decide the proper scale for the risk adjustment," but recognized in dicta that "courts have generally approved adjustments of 1% to 3%." *Id*. at 480. In that regard, the Court noted that it need not address the appropriate scale for the risk adjustment because

> [t]ogether with the cramdown provision, [the feasibility requirement] obligates the court to select a rate high enough to compensate the creditor for its risk but not so high as to doom the plan. If the court determines that the likelihood of default is so high as to necessitate an eye-popping interest rate, the plan probably should not be confirmed.

*Id.* at 480-81 (internal quotation omitted). Indeed, Justice Thomas stated in concurrence that "[i]n most, if not all, cases, where the plan proposes simply a stream of cash payments, the appropriate risk-free rate should suffice." *Id*. at 487 (Thomas, J. concurring).

Section 1129(a)(10) requires that at least one class of claims impaired by the plan, if any exist, accept the plan. Notably, however, such determination is made "without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). As is applicable here, the term "insider" includes a director, officer, or person in control of the debtor, a partnership in which the debtor is a general partner, a general partner of the debtor, or a relative of any of the individuals listed. *See* 11 U.S.C. § 101(31)(B) (defining "insider" for a corporate debtor). Additionally, courts have developed factors that may render a party a non-statutory insider because the Bankruptcy Code's definition of "insider" is non-exhaustive. *See In re PHS Group, Inc.*, 581 B.R. 16, 31 (Bankr. E.D.N.Y. 2018) ("Courts, recognizing that this statutory definition was not intended to be an exhaustive or exclusive list . . . have developed the notion of a 'non-statutory' insider.").

"A creditor is not a non-statutory insider unless: (1) the closeness of its relationship with the debtor is comparable to that of the enumerated insider classifications in § 101(31), and (2) the relevant transaction is negotiated at less than arm's length." *In re Vill. at Lakeridge, LLC*, 814 F.3d 993, 1001 (9th Cir. 2016) (citing *Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.)*, 531 F.3d 1272, 1277 (10th Cir. 2008)). Determining whether a creditor is a non-statutory insider requires a fact-intensive analysis "to determine if a creditor and debtor shared a close relationship and negotiated at less than arm's length." *Id*. at 1002. "This category includes those individuals

7

or entities whose business or professional relationship with the debtor compels the conclusion that the individual or entity has a relationship with the debtor, close enough to gain an advantage attributable simply to affinity rather than to the course of business dealings between the parties." *Vill. at Lakeridge, LLC v. U.S. Bank, N.A. (In re Vill. at Lakeridge, LLC)*, Bankr. No. 11-51994-BTB, 2013 WL 1397447, at *5 (9th Cir. BAP Apr. 5, 2013) (internal quotation omitted). Notably, the court determines insider status at the time of voting. *See In re Rexford Props., LLC*, 557 B.R. 788 (Bankr. C.D. Cal. 2016) (identifying "abundant persuasive authority," including the Second Circuit and sister bankruptcy courts in the Fourth Circuit, finding the time of voting to be the operative date for determining insider status).

Finally, the court shall confirm a proposed plan only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). Section 1129(a)(11) is commonly known as the "feasibility" requirement. The court's consideration in that regard "is whether the plan offers a reasonable assurance of success. Success need not be guaranteed." *In re Tree of Life Church*, 522 B.R. 849, 864 (Bankr. D.S.C. 2015) (quoting *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F. 2d 636, 649 (2nd Cir. 1988)).

> In analyzing feasibility, certain factors courts have considered include: the adequacy of the capital structure; the earning power of the business; economic conditions; the ability of management; the probability of the continuation of the same management; and any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*Id*. at 865 (internal quotation omitted).

In this context, where there are competing plans, the court must first determine whether each plan is confirmable under subsections (a) and (b) of § 1129. If both plans are confirmable, "the court may confirm only one plan . . . ." 11 U.S.C. § 1129(c). "[T]he court shall consider the preferences of creditors and equity security holders in determining which plan to confirm," *id*., and may also consider "(1) the type of plan; (2) the treatment of creditors and equity security holders; [and] (3) the feasibility of the plan." *In re Internet Navigator, Inc.*, 289 B.R. 128, 131 (Bankr. N.D. Iowa 2003) (citing *In re Holley Garden Apartments, Ltd.*, 238 B.R. 488, 493 (Bankr. M.D. Fla. 1999) (including the three identified factors with "the preferences of creditors and equity

security holders" expressed in § 1129(c))). "The type of plan is a key component. A reorganization plan is usually preferable to a liquidation plan." *In re Valley View Shopping Center, L.P.*, 260 B.R. 10, 40 (Bankr. D. Kan. 2001); *see* 7 Collier on Bankruptcy ¶ 1129.06 (16th 2019) ("In considering the policy of the Code, the court not only should give weight to the debtor protection aspects of the Code that weigh in favor of the plan which is preferred by ownership interests, but also should consider the purpose of the Code to give the debtor the best opportunity to successfully reorganize . . . ."))._ The court's decision under § 1129(c) is committed to its discretion. *Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 7 (D. Conn. 2006).

**B. The Debtor's Plan of Reorganization**

Turning first to consideration of the Debtor's proposed plan, the court finds that the plan meets the necessary requirements of § 1129(a) of the Bankruptcy Code and is otherwise fair and equitable as required by § 1129(b). Specifically, the court believes that the Debtor established by preponderant evidence that its proposed plan is feasible and that its proposed interest rate satisfies the Supreme Court's guidance in *Till*. Additionally, the court does not believe that the Debtor improperly classified Comm2013's unsecured claim or inappropriately modified the documents governing its relationship with Comm2013.

In fact, the court finds Comm2013's objections in those regards to be red herrings. Comm2013 argues that the Debtor improperly classified its claim by not recognizing secured and unsecured portions thereof consistent with § 506(a) of the Bankruptcy Code. It is true that § 506(a) involves the determination of a creditor's secured interest, but it has no bearing on proposed plan treatment or the court's consideration under § 1129. For instance, § 506(a) can be used to determine a creditor's secured interest in collateral, and its interest in that regard is generally capped at the value of its collateral. Here, the court valued The Crossings Mall at $13.1 million in conjunction with confirmation. Section 1123(a), however, provides the only mandatory requirements for the contents of a plan. It provides only that a plan shall, among other things, "specify the treatment of any class of claims or interests that is impaired under the plan" and "provide the same treatment for each claim or interest of a particular class . . . ." 11 U.S.C. § 1123(a)(3) and (4). There is no requirement in § 1123 or otherwise that a plan proponent treat an under-secured creditor in a bifurcated fashion as urged by Comm2013. Moreover, § 1122(a) regarding classification of claims informs the court's analysis here, and it provides that "a plan may place a claim . . . in a particular class only if such claim . . . is substantially similar to the other

9

claims . . . of such class." Here, even if the Debtor proposed to bifurcate Comm2013's allowed claim, the unsecured portion could reasonably be classified apart from other general unsecured claims based upon the bifurcated nature of the claim. In any event, the Debtor here does not propose to bifurcate the claim such that the court does not see a patent issue regarding plan classification.

Similarly, the court does not find anything impermissible about the Debtor's proposed modifications of its relationship with Comm2013. In that regard, Comm2013 contends that the Debtor proposes to extend the loan term nine years beyond the existing maturity and "eliminate nearly all existing loan terms." In support of its argument, it offered the testimony of Thomas Biafore. Mr. Biafore testified as to industry standards for commercial mortgage-backed securities and how the Debtor's proposed loan documents deviate from those standards. Mr. Biafore testified that the original Loan Agreement and associated documents governing the Debtor's relationship with Comm2013 are standard in the industry. He noted that certain of the terms are necessary for securitization of the loan and the maintenance of tax benefits for the trust in which the loan is securitized. Specifically, Mr. Biafore testified how Comm2013 is purportedly prejudiced by the "bare bones" loan documents proposed by the Debtor in conjunction with its plan of reorganization. Among other things, the removal of defeasance provisions and covenants that the Debtor not engage in other business are critical for investors of the underlying trust. Notably, however, the Debtor elicited on cross examination testimony indicating that the Debtor's proposed modifications do not disqualify the Debtor's loan from inclusion in the underlying trust; nor did it impair the trust's tax advantaged status. Simply put, while Comm2013 may be unhappy with the Debtor's proposed changes to the documents governing their relationship, the court does not perceive the changes to critically impair confirmation of the Debtor's plan. The court's focus here is not upon the marketability of the underlying trust to investors or the economic risk to which they are exposed but is on the potential reorganization of a seemingly viable economic enterprise.

Regarding confirmation, the court finds it appropriate to first determine whether the Debtor's proposed treatment of Comm2013 is fair and equitable, including whether the Debtor's proposed interest rate associated with its repayment of Comm2013's claim adequately compensates Comm2013 for risks associated with the Debtor's proposed plan. In that regard, the Debtor proposes an interest rate of 6.24%. It supports that rate with the expert opinion of Richard Gaudet. Mr. Gaudet testified that his prescribed rate is objectively grounded and consistent with

the Court's guidance in *Till*. Specifically, Mr. Gaudet employed the Expected Loss Formula, which he contends adequately compensates Comm2013 for its potential loss given, among other things, Comm2013's interest in The Crossings Mall and a maximum likelihood of default of 49.9 percent. According to Mr. Gaudet, any higher likelihood of default is immaterial because the court should not confirm a plan that is so infeasible.

Comm2013 objects to that proposed rate and contends that *Till* requires a rate of 8%. In support thereof, Comm2013 elicited the expert opinion of Adam Margolin. Mr. Margolin testified that the factors traditionally considered in determining an interest rate lead to a much higher rate to compensate Comm2013. Specifically, he made the following upward adjustments to the national prime rate of 5.5 percent: 50 basis points based upon "Circumstances of the Estate;" 70 basis points based upon "Nature of the Security;" 70 basis points based upon "Bankruptcy Plan Feasibility;" and 60 basis points based upon the "Term" of the Debtor's proposed repayment. Although the court finds both experts to be credible, it finds Mr. Gaudet's opinion to be more persuasive and appropriate here.

Notably, both experts agree that no efficient market exists for the financing at issue in this case such that determining the appropriate rate is subject to a *Till* analysis. In the court's view, Mr. Gaudet's opinion most closely aligns with the Supreme Court's guidance therein. Specifically, the court finds Mr. Gaudet's Expected Loss formula to be better grounded in a "straightforward, familiar, and objective inquiry . . . minimiz[ing] the need for potentially costly additional evidentiary proceedings." *Till*, 541 U.S. at 479. In that regard, Mr. Gaudet testified that the Expected Loss formula has been uniformly accepted as the international standard for risk management in banking. Additionally, it provides an arithmetical process to calculate what is necessary to compensate a secured lender subject to cram-down under § 1129(b)(2)(A)(i)(II). Indeed, that provision mandates simply that each qualified claimant "receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest . . . ." Although *Till* perhaps requires some additional interest component despite the language of the statute, *id*. at 483, the court believes its principal teaching is to employ a "straightforward, familiar, and objective inquiry . . . ." *Id.* at 479. The court finds that Mr. Gaudet's calculation, although perhaps not without its own shortcomings, employs such an approach. For instance, Mr. Gaudet assumes a maximum probability of default of 50%. That is in line with the *Till* plurality's notion that the

11

court employ the cramdown provisions of § 1129(b) in concert with the requirement that the proposed plan be feasible. If the court finds the plan infeasible (i.e., a probability of default greater than 50%), the court need not analyze the appropriate *Till* rate, because the debtor is nonetheless unable to achieve confirmation. Additionally, Mr. Gaudet calculates the Debtor-specific risk by employing the Expected Loss Formula to achieve a result that compensates Comm2013 only for the expected loss given the probability of default. Put another way, his approach first determines the potential cost to the secured creditor and then fixes an interest rate to compensate the creditor for that specific cost. Mr. Gaudet used the following example to illustrate the point: A loan to the riskiest borrower in the world fully secured by U. S. Treasury Bonds. In that circumstance, the borrower who seeks to reorganize represents a 100 percent probability of default, but the consequence of that default is 0 given the collateral securing the loan. Because 100 multiplied by 0 equals 0, there is no risk imposed by the debtor's proposed plan above the risk the lender would incur to a prime-quality borrower. The court finds this type of analysis logical, persuasive, and in line with the *Till* plurality's guidance.

Despite also finding Mr. Margolin credible, the court does not find his analysis persuasive based upon its subjectivity and what the court perceives to be an overstatement of the debtor-specific risk of default to be borne by Comm2013. In that regard, Mr. Margolin prefaced his testimony with his perspective as an investment banker and his work assessing risk and pricing commercial real estate loan transactions. He went on to note that he views the assessment of risk to be both subjective and objective. The court views his testimony to be too subjective in the context of *Till*. For example, Mr. Margolin did not have objective rationale for his adjustment to the prime interest rate. He testified that his 50 basis-point increase for the estate's circumstances is based upon, at least in part, the Debtor not having unencumbered cash, no equity in its property, and an immediate risk of default under the plan if the Debtor was not successful in obtaining the anticipated $400,000 from Emerald Grande. Mr. Margolin found the proposed contribution from Emerald Grande so speculative that he almost entirely dismissed the notion that the Debtor would receive the $400,000. He flatly ignored the Debtor's prospect in that regard based upon Emerald Grande also being in bankruptcy and it purportedly having no equity in its property. During cross-examination, for instance, Mr. Margolin noted that he had no personal knowledge of the on-going negotiations between the parties in the Emerald Grande case and the Debtor. The court is unpersuaded by such a subjective analysis, particularly given Mr. Margolin's casual indifference

to the Debtor's efforts to realize the $400,000. Additionally, the Debtor presented uncontroverted testimony that one of its principals, or at least a relative thereof, possesses an interest in a non-debtor entity that can be used to support, in part, the Debtor's reorganization. Specifically, Robert Abbruzino testified that he possesses an interest in an entity he identified as Metro Management. According to Mr. Abbruzino, that entity engages in retail development in Fort Myers, Florida and generates income to him through the payment of what he characterized as fees. Although Mr. Abbruzino's testimony was vague at times, it was nonetheless uncontroverted. Moreover, Mr. Margolin testified that the lack of access to non-debtor financial support factored into his *Till* analysis, but he seemingly did not investigate the Debtor's anticipated support from Metro Management to justify his adjustment of the primate rate; again, evidencing the subjective nature of his analysis. Indeed, the Debtor's monthly operating reports indicate, at least from time to time, that non-debtor entities support the Debtor's continued reorganization effort. Based on the foregoing, the court finds Mr. Gaudet's opinion to be more reliable and persuasive.

Having determined that the Debtor's proposed treatment of Comm2013 satisfies § 1129(b)(2)(A)(i), the court must determine whether such proposal is feasible—whether the Debtor has a reasonable chance of succeeding under the terms of its proposed plan. In that regard, the court heard testimony from Comm2013's expert, Mark Gleason, and the Debtor's expert, Robert Nistendirk, and each expert submitted a report containing their respective findings. Additionally, the court heard from a Debtor representative, Robert Abbruzino, regarding the Debtor's anticipated business prospects postconfirmation.

Mr. Gleason opined that the Debtor's proposed plan was not feasible for several reasons. First, he noted the highly speculative nature of the proposed infusion of $400,000 from the bankruptcy estate of Emerald Grande. Additionally, Mr. Gleason testified that the Debtor did not adequately account for lease vacancy during the life of the proposed plan or account for management fees, leasing commissions, and tenant improvements. At bottom, Mr. Gleason testified that the Debtor's anticipated cash flow is simply not reliable enough to support a feasible plan. Mr. Nistendirk testified that his projections did, in fact, account for lease vacancy, albeit in a circuitous manner. He also testified as to why he excluded management fees, leasing commissions, and tenant improvements. Additionally, the Mr. Abbruzino gave uncontroverted testimony regarding the Debtor's difficulties leasing vacant space based upon the pendency of this case and the nature of Comm2013's participation therein. He thus asserted that the Debtor

13

anticipates its prospects post-confirmation to be more favorable than to date navigating this case with an aggressive creditor like Comm2013. Finally, the Debtor representative testified, albeit vaguely, regarding potential infusions of capital he may make to assist the Debtor's performance under its plan.

Based upon the totality of the evidence in the record and adduced at trial, the court finds that the Debtor's plan is feasible and not likely to be followed by liquidation or other financial reorganization other than that proposed by the Debtor in its plan. Notably, the court did not find either expert to be more reliable than the other but finds that the record shows that it is more likely than not that the Debtor can succeed in its plan of reorganization. Specifically, the court believes that a reasonable prospect exists for the Debtor to perform under its proposed plan. Notably, the Debtor has performed to date. Pursuant to the terms of the court's order authorizing the Debtor's request for post-petition financing, the Debtor paid to Applied Construction Solutions, Inc. ("Applied"), and SLS Land & Energy Development ("SLS") twenty-three monthly payments of $48,376.72, totaling $1,112,664.56. Its payments in that regard were traceable to rent paid by Kroger and Kmart. At the same time, the Debtor paid to Comm2013 court-ordered adequate protection payments of $68,750.56 monthly. The Debtor's obligation to Applied and SLS concluded such that the Debtor seemingly has additional cash flow to support its plan of reorganization—specifically, its payment to Comm2013.[3] In that regard, the Debtor proposes in its plan to now increase its payment to Comm2013 to $86,000 per month and make additional annual payments to Comm2013 of half the Debtor's Annual Excess Available Cash, which mean "on an annual basis, the amount by which cash received by the Debtor from all sources exceeds the total of all (i) payments required under the Plan, and (ii) costs of operation, including without limitation Administrative Expense Claims, property taxes, insurance, common area maintenance and capital repairs."

Additionally, the court believes that the Debtor has reasonable prospects to increase its tenant base and rental income. Mr. Abbruzino testified about his extensive communications with prospective tenants and the difficulty this bankruptcy case and Comm2013's aggressiveness posed

---

[3] The court notes that the Debtor may be looking for a prospective tenant to replace Kmart, which the court understands may have recently vacated The Crossings Mall. Nonetheless, the court discerns that Kroger's monthly rent of at least $26,000 is now available for the Debtor to include with the $68,750.56 it previously paid monthly to Comm2013.

14

for the Debtor in that regard. Although Mr. Abbruzino's testimony was vague at times, it was uncontroverted. In the court's view, the Debtor's new lease with Charter Central, LLC ("Charter"), a Taco Bell franchisee, corroborates Mr. Abbruzino's testimony. The court will not now rehash what transpired between the Debtor and Comm2013 in that regard, but the court finds Mr. Abbruzino's testimony regarding the Debtor's difficulty operating in Chapter 11 versus its post-confirmation business prospects to be persuasive based upon its experience presiding over the Debtor's attempt to enter into its lease with Charter. To be clear, the court is cognizant that the Charter lease is incorporated into the feasibility projections used by the parties' experts. What the court finds persuasive, however, is not the Charter lease as evidence of additional cash flow but as evidence of favorable prospects post-confirmation.

Finally, the court notes that the Debtor succeeded in settling its administrative expense claim against Emerald Grande, LLC. Specifically, the court approved the Debtor's settlement with Emerald Grande whereby, among other things, the Debtor receives $400,000. Notably, the payment in that regard is the result of Emerald Grande's compromise with its principal lender, and the funds come from the lender's collateral such that the court does not doubt whether the payment will be made. The Debtor relied heavily on the $400,000 infusion to support the feasibility of its proposed plan. Many were skeptical that the Debtor would succeed in that regard, particularly with Emerald Grande in Chapter 11 itself. At bottom, however, the anticipated infusion of $400,000 to the Debtor's bankruptcy estate supports feasibility of its proposed plan, at least partially.

Based upon the foregoing, the court finds that the Debtor's proposed plan is feasible. Notably, the court need not find a likelihood of guaranteed success but only a reasonable prospect. The court believes such a reasonable prospect exists such that it will afford the Debtor the opportunity to perform under its proposed plan of reorganization.

## C. Comm2013's Plan of Liquidation

Having determined that the Debtor's plan is confirmable, the court must also determine whether Comm2013's proposed Chapter 11 plan is confirmable. Its examination in that regard is generally much simpler given Comm2013's proposal to liquidate The Crossings Mall. In that regard, the court likewise finds that Comm2013's plan meets the confirmation requirements of § 1129(a) of the Bankruptcy Code, and the court is unpersuaded by the Debtor's objections to the proposed plan. Specifically, the Debtor contends that Comm2013's plan does not comply with §

15

1129(a)(3) because: 1) Comm2013 is not authorized under its PSA to file a competing plan in this case; and 2) Comm2013 has a conflict of interest. Additionally, the Debtor contends that Comm2013 did not obtain acceptance of its plan from at least one impaired class because it is an insider and its vote was the only one accepting its plan.

Regarding the Debtor's arguments under § 1129(a)(3) of the Bankruptcy Code, both fall short of impeding confirmation because they are beyond the scope of the court's consideration of good faith. The court is aware of nothing in the Bankruptcy Code or at non-bankruptcy law that prevents Comm2013 from filing a competing plan in this context, and the Debtor has not directed the court's attention to anything that, as a matter of law, proscribes Comm2013's conduct in that regard. Rather, the Debtor simply contends that Comm2013's competing plan is not authorized by the PSA and that Comm2013 has a conflict of interest in proposing a competing plan of liquidation. As the court notes above, however, its focus is generally on whether the proposed plan is to be implemented by means prohibited by law; whether the proposal of the plan is authorized as a matter of contract or consistent with other duties Comm2013 may have to non-debtor entities is vastly different. Even if Comm2013 is acting outside the bounds of its authority under the PSA or in violation of any duty it may owe, the court does not perceive this to be the appropriate forum—and § 1129(a)(3) is not the appropriate vehicle—for enforcement in that regard. Rather, it is a matter of contract among those entities to the PSA to be resolved, if at all, in a non-bankruptcy forum. Put simply, the Debtors' arguments do not frame the issue as to what is legal versus illegal but simply whether Comm2013 is acting consistent with its duties to non-debtor entities. Finally, the court also perceives the purported deficiency raised by the Debtor to be one that is capable of ratification. Here, no party to the PSA or securitized trust is before the court seeking to enjoin Comm2013's conduct. Based upon the foregoing, the court is confident that Comm2013's plan is proposed in good faith and not by any means prohibited by law.

The court also finds that Comm2013 is not an insider, statutory or otherwise. Therefore, its vote supporting its proposed plan qualifies to give it an impaired class accepting its plan. In that regard, the court finds as unpersuasive the Debtor's contention that Comm2013 exercised sufficient control over it so that the court should find that Comm2013 is an insider whose vote cannot be counted under § 1129(a)(10). First, the court does not believe that Comm2013 exerted control over the Debtor on anything other than an arms-length basis. In the court's view, Comm2013 exercised rights it possessed under the Loan Agreement and related documents

16

governing its creditor-debtor relationship with the Debtor. Those rights are likely the same or substantially similar for all the loans in the securitized trust to which the Debtor's loan was assigned. It is hard to imagine, therefore, Comm2013's role vis-à-vis the Debtor as anything other than arms-length absent Comm2013 acting beyond the scope of the Loan Agreement and related documents. There is no evidence that Comm2013 took an active role in the management of the Debtor—for instance, acting on the Debtor's behalf to personally advertise for and solicit prospective tenants, suggesting or making discretionary modifications to the Debtor's property to make it subjectively more appealing and profitable, personally ordering maintenance at the Debtor's property, or otherwise holding itself out to third parties as an agent for or joint venturer with the Debtor.

More importantly, most of the conduct complained of by the Debtor occurred long before Comm2013 voted in favor of its plan to liquidate the Debtor's property. In that regard, Comm2013 cast its ballot on November 1, 2018, but the critical conduct complained of by the Debtor all occurred before that date. Specifically, Comm2013 did not approve the Debtor's request for Capital Expenditure Funds pre-flood in 2016, did not agree with the Debtor's proposal to restore access to The Crossings Mall post-flood and pre-petition, and did not otherwise acquiesce or support the Debtor's effort to reorganize, including approving a lease that involved destroying a portion of its collateral. Its obstinateness, however, was based upon it affirmatively pursuing its rights and remedies and not an effort to control the Debtor. The court, therefore, does not view any of that conduct as sufficient to qualify Comm2013 as an insider whose votes shall be excluded under §1129(a)(10).

### III. CONCLUSION

Based upon the analysis herein, the court finds that both plans are confirmable. The court finds it appropriate in its discretion to confirm the Debtor's proposed plan, and it will enter a separate order in that regard. As the court noted above, Comm2013 is the only creditor with an allowed claim supporting its proposed plan. Although the amount of Comm2013's claim overshadows the respective amounts of other claims in the case, the overwhelming number of claimants, who are members of the community served by the Debtor, support the Debtor's proposed reorganization. Comm2013 proposes to take title to the Debtor's property and liquidate its interest therein, but its liquidation in that regard will likely result in it receiving far less than under the Debtor's plan and will almost assuredly result in the end of the Debtor. Given a choice,

the court finds that its discretion is better employed to promote the Debtor's reorganization, particularly when the Debtor's principals originally developed The Crossings Mall many years ago and the Debtor experienced its recent financial pressure only after a significant weather event that shuttered The Crossings Mall. The court, therefore, will enter a separate order confirming the Debtor's proposed plan of reorganization.