**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

_____

|  |  |  |
|---|---|---|
| In re: | ) | Case No.: 17-00057 |
|  | ) | Chapter 11 |
| TARA RETAIL GROUP, LLC, | ) |  |
|  | ) | Related to Doc. No. 1345, 1313, 1315 |
| Debtor. | ) |  |
|  | ) |  |

_____

**MEMORANDUM OF LAW IN SUPPORT OF COMM 2013-CCRE 12 CROSSINGS
MALL ROAD, LLC'S MOTION TO CLARIFY, AMEND AND/OR RECONSIDER
CONFIRMATION ORDER DATED JANUARY 27, 2020 [ECF 1315] AND RELATED
MEMORANDUM OPINION [ECF 1313]**

COMM 2013 CCRE12 Crossings Mall Road, LLC ("Secured Creditor") respectfully

submits this Memorandum of Law in Support of its Motion (the "Motion") [ECF 1345] for an

Order to Clarify, Amend and/or Reconsider that certain Order [ECF 1315] and Memorandum

Opinion [ECF 1313] (collectively, the "Confirmation Order") confirming the Modified Second

Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code Proposed by Tara

Retail Group, LLC [ECF 834-1] (the "Plan") pertaining to the Debtor's proposed new loan

documents.

## INTRODUCTION

1.      After the Confirmation Order was entered the Debtor requested that Secured

Creditor sign new loan documents that exceed the scope of those described in the Plan and

authorized by the Court.  Debtor's proposed new loan documents create confusion and further

erodes Secured Creditor's collateral position and quite possibly REMIC status.  With these new

loan documents the Debtor is actually trying to change Secured Creditor's collateral and lien

rights by eliminating Secured Creditor's lien on leases and condemnation awards and only

securing the principal loan balance.  As explained in the accompanying affidavit from Thomas

Biafore ("Biafore Affidavit") whom the Court has already qualified as an expert on REMIC

issues, any change to the collateral of Secured Creditor will not only disqualify the Debtor's loan from REMIC status and jeopardizes REMIC status of the entire trust and creating substantial tax uncertainties for the certificateholders which Secured Creditor never bargained for on this credit.

2.     Judicial intervention is needed to provide clarity.  Absent this clarity, the parties are at risk of further appeals and litigation over how to implement the Plan.

3.     As a preliminary matter, under the Plan the Debtor is only given permission to cancel and replace Debtor's promissory note and loan agreement. [ECF 834-1, §§ 4.1, 5.8] However, Debtor only attached a proposed new loan agreement to the Plan.  Debtor never attached the form of a new promissory note to the Plan.  Therefore, only the loan agreement should be amended and replaced.  The Court has never seen or more importantly approved the form of a new note or any other new loan documents.

4.     Moreover, nowhere does the Plan refer to the cancellation and replacement of the deed of trust, security agreement, assignment of leases and rents, environmental indemnity, personal guarantees or other loan documents.  Accordingly, those existing loan documents should remain intact and undisturbed by the Confirmation Order.

5.     Despite the express boundaries of the Plan, after the Court issued the Confirmation Order, in addition to a new loan agreement, Debtor asked the Secured Creditor to sign a new promissory note, deed of trust and security agreement, the forms of which were never attached to the Plan or approved by the Court.  When confronted by this overreach, Debtor argues that an oblique reference in Debtor's proposed new loan agreement to a new deed of trust and security agreement is sufficient to give Debtor free reign to propose any terms its wants for a new promissory note, deed of trust and security agreement.

6.      As discussed in more detail below, Section 1127(b) of the Bankruptcy Code protects against a Debtor attempting to expand or change plan terms after confirmation by requiring any such changes to be approved by the Court after a notice and a hearing.  The Court must also find that the proposed changes with regard to the new loan documents satisfy the requirements of Code Section 1129.  Here, the Debtor is skipping over this process and trying to enforce changes without Court approval.

7.      Given the above, Secured Creditor respectfully requests that the Court clarify that (i) the Secured Creditor is not required to sign any new loan documents other than a new loan agreement and (ii) all the other existing loan documents (other than the existing loan agreement) remain in full force and effect.  With this clarity, Debtor will have to decide whether it wants to proceed with a motion for relief under Section 1127(b) to implement a new promissory note, deed of trust and security agreement.  In that circumstance, the Court will have to decide whether relief under Section 1127(b) is available to the Debtor.

8.      In the alternative, if the Court for some reason finds that the Plan requires the Secured Creditor to sign all the new loan documents prepared by the Debtor and transmitted to Secured Creditor outside the Plan and without Court approval, Secured Creditor respectfully requests that the Court alter or amend the Plan to change certain of the proposed new loan terms as the current proposed terms has a disastrous effect for Secured Creditor.

## **BACKGROUND**

### A.      **The Original Loan Documents.**

9.      Secured Creditor is Debtor's primary secured lender by virtue of a $13,650,000 loan (the "Loan") made by Secured Creditor's predecessor, UBS Real Estate Securities, Inc. ("Original Lender") to Debtor on or about September 17, 2013 (the "Loan Origination Date"). [ECF Claim No. 2; ECF 17, ¶ 7]

3

10.    As set forth more fully in Secured Creditor's proof of claim [ECF Claim No. 2], the Loan is evidenced by, among other things, the following documents (collectively, and with all other documents evidencing the Loan, the "Original Loan Documents"), which documents have been assigned[1] to Secured Creditor:

- Loan Agreement ("Original Loan Agreement") executed by Debtor and Original Lender (**Exhibit A**)[2];

- Promissory Note ("Original Note") dated as of the Loan Origination Date, executed by Debtor (**Exhibit B**);

- Deed of Trust and Security Agreement (the "Original Deed of Trust") executed by Debtor (**Exhibit C**);

- Assignment of Leases and Rents ("Original ALR") executed by Debtor (**Exhibit D**);

- Guaranty of Recourse Obligations ("Original Guaranty") executed by William and Rebecca Abruzzino (**Exhibit E**);

- Environmental Indemnity Agreement ("Environmental Indemnity") executed by Debtor and William Abruzzino (**Exhibit F**); and

- Cash Management Agreement ("Original Cash Management Agreement") executed by Debtor (**Exhibit G**).

11.    Pursuant to the Original Deed of Trust and Original ALR, Original Lender was granted a security interest and lien on all of the Debtor's assets, including, without limitation, the Debtor's real estate (including an absolute assignment of all leases and interests relating to leases), personal property, and all rents and revenues generated therefrom (the "Property").

12.    Original Lender perfected its interests in the Property by recording the Original Deed of Trust and Original ALR in the land records of Kanawha County and by filing UCC-1 Financing Statements with the West Virginia Secretary of State. [ECF Claim No. 2-2]

---

[1]    Assignments of the Loan and Original Loan Documents are attached to Secured Creditor's Proof of Claim [ECF Claim No. 2-2] and are incorporated herein by reference.

[2]    For the Court's convenience, Exhibits supporting the Motion will be submitted in a separate indexed pleading.

13.     As of March 1, 2019 the balance due and owing under the Original Loan Documents, including post-petition interest and fees, was $19,014,111.65.  [ECF Claim No. 2-2]

**B.    The Bankruptcy Case and Debtor's Plan.**

14.     The Debtor commenced this bankruptcy case on January 24, 2017 (the "Petition Date") by filing a voluntary petition for relief under 11 U.S.C. § 101 *et. seq.* (the "Bankruptcy Code").

15.     On September 28, 2018, Debtor filed its Modified First Amended Disclosure Statement to Accompany the Modified Second Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code Proposed by Tara Retail Group, LLC ("Disclosure Statement") and Plan. [ECF 834]

16.     Section 4.1 of the Plan provides that the Original Loan Agreement and Original Note will be replaced with a "New Loan Agreement" and "New Promissory Note" upon confirmation of the Plan:

> **4.1 Class 1 – Comm 2013 Secured Claims**. … Pursuant to Section 5.8 of the Plan, on the Confirmation Date, the New Promissory Note and New Loan Agreement will be issued to Comm 2013, and the existing Promissory Note and Loan Agreement will be cancelled.

[ECF 834-1, § 4.1]

17.     Section 5.8 of the Plan provides only for a "New Loan Agreement:"

> **5.8 Cancellation of Loan Agreement and Creation of New Loan Agreement**.  On the Confirmation Date, the Loan Agreement relating to the Class 1 Claim of Comm 2013 will be cancelled and discharged, without further act or action under any applicable agreement or Law, and the New Loan Agreement will be issued to Comm 2013.  A copy of the proposed New Loan Agreement is attached hereto as **Exhibit 2**.

[ECF 834-1, § 5.8]

18.     **Notably, the Plan does not require any change to Secured Creditor's collateral package, replacement of its liens, or displacement of any other loan documents other than the Original Loan Agreement and Original Promissory Note.**

19.     A form "New Loan Agreement" is attached to the Plan.  [ECF 834-1, Ex. 2] The form of a "New Promissory Note" is <u>not</u> attached to the Plan and has never been approved by the Court.

20.     The "New Loan Agreement" attached to the Plan includes a reference Debtor will execute a new loan agreement, note, deed of trust and security agreement (the "<u>Replacement Collateral Documents</u>").  [ECF 834-1, Exhibit 2, pp. 2-5]  However, the form of a new note, deed of trust and security agreement are not attached to the Plan and have never been approved by the Court.

21.     The Plan also requires William and Rebecca Abruzzino and to execute a new guaranty (also a Replacement Collateral Document).  [ECF 834-1, Exhibit 2, pp. 2-5].  Despite this, the Debtor never attached the form of this guaranty to the Plan nor has the Debtor ever proposed a new guaranty.

22.     The Plan is silent as to whether the Original Cash Management Agreement, ALR, Deed of Trust, and Environmental Indemnity remain in full force and effect after confirmation, and so these documents must remain intact and unaltered after the Confirmation Order.

   **B.     Confirmation Order and Proposed New Loan Documents.**

23.     On January 27, 2019, the Court entered the Confirmation Order confirming Debtor's Plan over Secured Creditor's objection.  In its Memorandum Opinion, for new loan documents, the Court only acknowledged that under the Plan the Debtor would enter into the New Promissory Note and New Loan Agreement.  [ECF 1313, p. 4]  The Court said nothing about a new deed of trust or security agreement or any change to the collateral description.

24.     Following confirmation of the Plan, Debtor's counsel provided Secured Creditor with the following proposed loan documents (the "Debtor's New Loan Documents"):

- Loan Agreement ("Debtor's New Loan Agreement") (**Exhibit H**);

- Promissory Note ("Debtor's New Promissory Note") (**Exhibit I**);

- Deed of Trust ("Debtor's New Deed of Trust") (**Exhibit J**);

- Security Agreement ("Debtor's New Security Agreement") (**Exhibit K**).

25.     After counsel for Secured Creditor expressed concern about the Debtor's New Loan Documents, on February 7, 2020, the Court held a status conference with respect to the Confirmation Order and directed Secured Creditor on or before February 12, 2020 to file a motion seeking clarification, amendment or reconsideration of the Confirmation Order with respect to the scope of Debtor's New Loan Documents.

26.     On February 10, 2020, Secured Creditor filed the Motion.

## ARGUMENT

I.     **SECURED CREDITOR RESPECTFULLY REQUESTS CLARIFICATION THAT THE PLAN AND CONFIRMATION ORDER DO NOT REQUIRE SECURED CREDITOR TO EXECUTE THE REPLACEMENT COLLATERAL DOCUMENTS.**

A.     **Legal Standard for Clarification.**

27.     A "motion for clarification" is not a formal creature of civil procedure; it appears nowhere in the Federal Rules. Nevertheless, federal courts permit parties to tender motions that beseech the court "to explain or clarify something ambiguous or vague" about a ruling, but not to "alter or amend" it. *All. of Artists & Recording Cos. v. GM Co.*, 306 F. Supp. 3d 413, 418 (D.D.C. 2016) (*quoting United States v. Philip Morris USA, Inc.*, 793 F. Supp. 2d 164, 168 (D.D.C. 2011), and *Resolution Trust Corp. v. KPMG Peat Marwick*, 1993 U.S. Dist. LEXIS 16546, 1993 WL 211555, *2 (E.D. Pa. June 8, 1993)). Although such a motion cannot open the

7

door to "relitigat[ing] a matter that the court has considered and decided," *Id*. (*quoting SAI v. Transp. Sec. Admin.*, 2015 U.S. Dist. LEXIS 192323 at *8 (D.D.C. Aug. 19, 2015), ECF No. 74 (citation omitted), courts permit parties to file motions for clarification when they are uncertain about the scope of a ruling. *Id.*; *see United States v. Volvo Powertrain Corp.,* 758 F.3d 330, 344, 411 U.S. App. D.C. 139 (D.C. Cir. 2014) (allowing motion to clarify consent decree); *Barnes v. Dist. of Columbia*, 289 F.R.D. 1, 12-13 (D.D.C. 2012). Entertaining such motions seems especially prudent if the parties must implement the ruling at issue at subsequent stages of the litigation. *All. of Artists & Recording Cos.*, 306 F. Supp. 3d at 418; *but see Chase v. Town of Ocean City*, 2015 U.S. Dist. LEXIS 109959, at *26, 2015 WL 4993583 (D. Md. August 19, 2015) (denying clarification for lack of active case or controversy, where construing new ordinance would amount to advisory opinion).

28.    A plan may only be modified after confirmation and before substantial consummation upon a notice and motion under Section 1127(b) of the Bankruptcy Code, which states:

> (b) The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under Section 1129 of this title.

11 U.S.C. 1127(b).

29.    "The standard for modification is significantly more restrictive for post-confirmation modifications than for pre-confirmation modifications." *Antiquities of Nev. v. Bala Cynwyd Corp. (In re Antiquities of Nev.),* 173 B.R. 926, 928 (B.A.P. 9th Cir. 1994). "In enacting section 1127(b), Congress intended to "safeguard the finality of plan confirmation." 7

8

Collier on Bankruptcy P 1127.03; *In re Dean Hardwoods, Inc.*, 431 B.R. 387, 394 (Bankr. E.D.N.C. 2010)

30.     The notice and hearing requirements of Section 1127(b) are important due process rights of creditors.  *In re Evans*, No. 04-03288-8-DMW, 2015 Bankr. LEXIS 2970, at *7-8 (Bankr. E.D.N.C. Sep. 3, 2015) (debtor could not submit a motion seeking requiring alternative treatment of claim because creditor "did not receive the due process protection required under 11 U.S.C. § 1129 as cited in § 1127(b)."); *In re Envirodyne Indus.*, 29 F.3d 301, 304 (7th Cir. 1994) ("if modification of a plan of reorganization would upset legitimate expectations, it may be refused"); *United States Brass Corp. v. Travelers Ins. Grp., Inc. (In re United States Brass Corp.),* 301 F.3d 296, 309 (5th Cir. 2002) (bankruptcy plan could not be modified under 1127(b) because the proposed modification would "alter the parties' rights, obligations, and expectations under the plan").

### B.     Request for Clarification.

31.     Here, the Secured Creditor seeks necessary clarification from the Court that Secured Creditor is not required to sign the Replacement Collateral Documents (defined above in Paragraph 19) under the Plan.  The Plan never mentions that the Replacement Collateral Documents would need to be signed, so it is impossible to conclude that these loan documents are required.  Moreover, Debtor never attached the form of the Replacement Collateral Documents to the Plan, so it is impossible to conclude that the Court previously approved the form of these documents.[3]

32.     Once the Court confirms the limits of the Plan and Confirmation Order, Debtor will need to decide whether it will pursue a motion to amend or modify the Plan pursuant to

---

[3]     The Secured Creditor further requests clarification that the Original ALR, Cash Management Agreement, Environmental Indemnity and Guaranty remain in full force and effect under the Plan.  Nowhere does the Plan mention that these documents will be cancelled or replaced.

Bankruptcy Code Section 1127(b) to create a new Plan requirement that the Secured Creditor execute the Replacement Collateral Documents.  In connection with such a motion, the Secured Creditor will have notice and an opportunity to be heard.  But what the Debtor is proposing now is improper.

**C.    The Replacement Collateral Documents Cannot be Changed without a Bankruptcy Code Section 1127(b) Motion.**

33.    The Replacement Collateral Documents must be brought through a motion under 11 U.S.C. § 1127(b).  Debtor has not filed a 1127(b) Motion, but if it did, that Motion would fail because the Debtor's Replacement Collateral Documents go beyond the scope of what is permitted section 1123(a)(5) of the Bankruptcy Code.[4] That section only permits modification as required to "provide adequate means for the plan's implementation." 11 U.S.C. § 1123(a)(5). Modifications must be "sufficient to implement the plan, equal to what is required, but also ***not more than is required***." *Irving Tanning Co. v. Me. Superintendent of Ins. (In re Irving Tanning Co.)*, 496 B.R. 644, 664 (B.A.P. 1st Cir. 2013) (emphasis added).  Moreover, the wholesale destruction of the loan protections alter lien rights in violation of section 1129(b)(2)(A)(i) which requires that the holder of a secured claim "retain the lien ... securing such claim ...." in a cram down. 11 U.S.C. § 1129(b)(2)(A)(i); *see also In re Arnold & Baker Farms*, 85 F.3d at 1420. This requirement is not satisfied where, as here with Debtor's Plan, the Debtor proposes to radically modify a secured creditor's lien rights with respect to collateral.  *See, e.g., In re Investment Co. of the Southwest, Inc.*, 341 B.R. 298, 318 (B.A.P. 10th Cir. 2006) (holding plan modified secured creditor's rights with respect to its collateral by providing for sale of collateral without secured creditor's lien attaching to all proceeds of the sales).

---

[4]    However, it is worth noting that it is highly unlikely that the Debtor could ever satisfy the requirements of Bankruptcy Code Section 1127(b) because the Debtor's New Loan Documents are completely unworkable and violative of Bankruptcy Code Sections 1123(a)(5) and 1129(b)(2)(A)(i).

34.     While "[t]he covenants to be included in the loan documents of a cram down need not precisely track the covenants in the parties existing loan agreement, [however,] the covenants should not leave the lender so bare of protection as to greatly increase the risk or require a corresponding increase in the interest rate." *In re P.J. Keating Co.*, 168 B.R. 464, 473 (Bankr. D. Mass. 1994).  Indeed, the *Keating* court noted that even the elimination of a single covenant could be sufficient to thwart confirmation of a plan.  *See id.*

35.     Here, with the Debtor's New Loan Documents, Debtor proposes a radical and unjustified transformation of the Secured Creditor's currently existing lien, which was never considered during the confirmation process and is wholly inappropriate and problematic now.

36.     **First**, Debtor proposes the cancellation of the Original Deed of Trust which will cause Secured Creditor to lose its lien priority to other liens, easements and encumbrances.  As explained by REMIC expert Tom Biafore, this change in lien priority will lead to the disqualification of the loan in a REMIC pool, which has signification ramifications for the Secured Creditor.

37.     **Second**, under the New Deed of Trust, the Debtor directly attacks the current scope of Secured Creditor's lien by:

- Eliminating any lien on leases and lease rights.

- Eliminating any lien on condemnation awards.

- Eliminating any lien on interest, fees and costs so that Secured Creditor will only be secured as to the principal loan balance.

38.     Again, as explained by Tom Biafore, changing the collateral definition will trigger a REMIC disqualification.

39.    **Third,** under the New Deed of Trust, Secured Creditor Debtor further proposes a radical transformation of the Secured Creditor's loan rights.  The following protections for the Secured Creditor under the Original Loan Documents would be eliminated:

- Maintain the Property in "good and safe condition and repair."

- Pay all labor and material costs to avoid mechanic's liens.

- Prohibition against junior liens.

- Permission for Secured Creditor to review books and records.

- Consent to a receiver upon a default.

- Indemnification for Secured Creditor for Property related losses.

- Jury trial waiver.

40.    **Fourth,** for no reason whatsoever, as set forth in Addendums A, B and C herein, Debtor has changed the collateral descriptions.  Again, Mr. Biafore confirms that changing the collateral is a disqualification event under REMIC laws.

41.    **Fifth,** under the New Promissory Note, Debtor requires all payments to be applied to principal first and then to interest, costs and fees.  This means that Secured Creditor cannot pay down the current interest owed and the Debtor is artificially amortizing the principal of the loan.

42.    Because of these reasons, the New Loan Documents are overbroad, places even more risk than originally contemplated pre-Confirmation, and should not be approved by the Court.  The Debtor should be made to propose only what was attached to its Plan.

## II. **ALTERNATIVELY, THE COURT SHOULD ALTER OR AMEND THE CONFIRMATION ORDER TO NOT REQUIRE SECURED CREDITOR TO EXECUTE THE REPLACEMENT COLLATERAL DOCUMENTS.**

### B. **Legal Standard to Alter or Amend.**

43.     There is no rule of civil procedure authorizing reconsideration and the rules do not expressly recognize motions for reconsideration. *East Sussex Children Servs. v. Morris*, No. 3:12-CV-141, 2013 US Dist Lexis 26825, 2013 WL 704660 (N.D. W. Va. Feb. 27, 2013). However, the Secured Creditor respectfully submits that the Court could amend or alter the Confirmation Order pursuant to Rules 59(e) and 60.

44.     Federal Rule of Civil Procedure 59(e) allows a court to alter or amend an earlier judgment (i) to accommodate an intervening change in controlling law; (ii) to account for new evidence not available at trial; or (iii) to correct a clear error of law or prevent manifest injustice. *Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 290 (4th Cir. 2002); *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396 , 403 (4th Cir. 1998); *Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993); *see also East Sussex Children Servs. v. Morris*, No. 3:12-CV-141, 2013 US. Dist Lexis 26825 (N.D. W. Va. Feb. 27, 2013) (case analyzing a Rule 59(e) motion); *Natural Resources Defense Council, Inc. v. EPA*, 705 F. Supp. 698, 701-702 (D.D.C. 1989) vacated on other grounds, 707 F.Supp. 3 (D.D.C.1989) (listing cases in other circuits reviewing Rule 59(e) motions).

45.     Rule 60(b) authorizes a district court to provide relief from an order due to:

(1)     mistake, inadvertence, surprise, or excusable neglect;

(2)     newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3)     fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4)     the judgment is void;

13

(5)     the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6)     any other reason that justifies relief.

46.     "In this circuit, the standard governing relief on the basis of newly discovered evidence is the same whether the motion is brought under rule 59 or rule 60. . . ." (citing *United States Fidelity & Guaranty Co. v. Lawrenson*, 334 F.2d 464, 475 n. 2 (4th Cir.), *cert. denied*, 379 U.S. 869 (1964)).  Concerning newly discovered evidence under Rule 59 or 60, a party must demonstrate: (i) the evidence is newly discovered since the judgment was entered; (ii) due diligence on the part of the movant to discover the new evidence has been exercised; (iii) the evidence is not merely cumulative or impeaching; (iv) the evidence is material; and (v) the evidence is such that it is likely to produce a new outcome if the case were retried, or is such that it would require the judgment to be amended. *Boryan v. United States*, 884 F.2d 767, 772 (4th Cir. 1989).

47.     Here, as set forth above, the Court should not require the execution of any Replacement Collateral Documents in connection with the Plan.  Nevertheless, to the extent the Court for some reason finds that under the current Plan some form of the Replacement Collateral Documents must be executed, relief here is warranted under (i) Rules 59(e) and 60 based on new evidence, (ii) Rule 59(e) to prevent manifest injustice, and (iii) under Rule 60 for any other reason that justifies relief.

**B.     Relief is Warranted Based on New Evidence.**

48.     For the following reasons, this Court may alter or amend the Confirmation Order on the basis of "newly discovered evidence":

14

49.   **First**, Debtor's New Promissory Note, Deed of Trust and Security Agreement are "newly discovered" because Debtor never attached the form of those documents to the Plan.  To date, Secured Creditor has not had the opportunity to object to these new loan documents.

50.   **Second**, Secured Creditor has gone to great lengths to preserve and protect its overall collateral package.  This diligence is evidenced by, among other things, the heavily contested bankruptcy case, Plan confirmation proceedings, the Taco Bell lease dispute, and the Emerald Grande easement dispute.

51.   **Third**, Debtor's New Promissory Note, Deed of Trust and Security Agreement are not cumulative of any evidence presented to the Court in confirmation proceedings.  Those documents are entirely new evidence.

52.   **Fourth**, the introduction of Debtor's New Loan Documents is material.  For the reasons explained above, Secured Creditor's lien (both the scope of the lien and the position of the lien vis-à-vis other creditors) is jeopardized if Secured Creditor is required to replace the Original Deed of Trust and Original ALR.

53.   **Fifth**, if Debtor's intention of replacing or cancelling all Original Loan Documents was properly before the Court at confirmation, it is very likely that the Court would have limited the relief sought to preserve Secured Creditor's lien, even if the loan payment terms are otherwise changed to facilitate the Debtor's reorganization.

**C.**   **Relief is Warranted to Prevent Manifest Injustice and is Otherwise Justified**

54.   The plain language of section 1129(b)(2)(A)(i) requires that the holder of a secured claim "retain the lien ... securing such claim ...." 11 U.S.C. § 1129(b)(2)(A)(i); *see also In re Arnold & Baker Farms*, 85 F.3d at 1420.  This requirement is not satisfied where a plan of reorganization proposes to radically modify a secured creditor's lien rights with respect to collateral.  *See, e.g., In re Investment Co. of the Southwest, Inc.*, 341 B.R. 298, 318 (B.A.P. 10th Cir. 2006) (holding plan modified secured creditor's rights with respect to its collateral by providing for sale of collateral without secured creditor's lien attaching to all proceeds of the sales).

55.   Debtor's New Loan Documents jeopardize Secured Creditor's lien rights in its collateral for the following reasons:

56.   **First**, Debtor's New Loan Documents – which contemplate a brand new Deed of Trust and Security Agreement with no relation to the Original Loan Documents – risk impairment of Secured Creditor's lien position and subrogation to intervening creditors.  The Original Deed of Trust and Original ALR have been of record since the Origination Date, and therefore enjoy priority over the vast majority of any known or unknown, recorded or unrecorded, liens and interests. Indeed, Secured Creditor paid for title insurance to guaranty the priority of that lien as of the Origination Date.

57.   If the Original Deed of Trust is expressly or impliedly cancelled by virtue of the execution of a new deed of trust, Secured Creditor's lien interest will no longer be continuous and will no longer enjoy its relative lien priority vis-à-vis other creditors.

58.   In effect, the Plan would require Secured Creditor's lien to be subordinated to any interests recorded in the property between the Origination Date and the present.  It is not entirely clear whether the Debtor intends for this to occur but it will as a matter of law.  Debtor has not

16

obtained any Court order for such relief in connection with the Plan or otherwise in this case and such a result could be more than problematic for the Secured Creditor.

59.    **Second**, Debtor has changed the collateral description and this has caused Secured Creditor to lose collateral.

60.    For example, Debtor's New Loan Documents do not provide Secured Creditor with any new assignment or pledge of the leases and lease-related interests at the Property.  As the Court is aware, leases are a critical component of the value of retail properties such as Crossings Mall and are a critical component of Secured Creditor's collateral package.

61.    The only way to ensure that Secured Creditor retains its bargained for collateral package is to leave the Original Collateral Documents in place.  Secured Creditor should receive the benefit of its original bargain with the Debtor with respect to its collateral, even if the loan payment terms are changed through the reorganization.

62.    **Third**, the release of any real estate collateral may result in impairment of the Loan's tax advantaged REMIC status and the tax advantaged status of the entire REMIC trust As set forth in the Biafore Affidavit, any change in the collateral package will trigger dire consequences for the Secured Creditor, the REMIC securitization in which the loan is held, and the investors.  The loan will no longer be qualified for a REMIC trust and any income from the loan will be taxed twice – once at the trust level and again at the investor level.

63.    As explained more fully in the Biafore Affidavit, a loan must be "principally secured" by "an interest in real property" to be eligible for REMIC qualification.  (Biafore Aff., ¶ 9).  The "principally secured" requirement is governed by various treasury regulations.  *Id.*, ¶ 10. For a loan to be "principally secured" by real estate, the value of the real estate must be equal to at least 80% of the outstanding loan balance at certain points in time, including following the

release of any real property securing the obligation (as described more fully in the Biafore Affidavit, the "80% test"). *Id*. ¶ 10-12.

64.    Here, given that Secured Creditor's Class 1 claim is well in excess of the value of the Property, any releases of real estate collateral (including assignments of leases and rents) for any period of time will trigger the "principally secured" analysis. The Property would inevitably fail the "80% test", and the Loan will cease to be a REMIC "qualified mortgage." (Biafore Aff., ¶¶ 10-14).

65.    If the loan ceases to be a REMIC qualified mortgage, the tax advantaged status of the entire securitization is jeopardized. (Biafore Aff., ¶8). If the securitization containing this loan is disqualified from REMIC status, the economic impact on the REMIC and its certificateholders could be as great as $20 million per year. (Biafore Aff., ¶ 7). Investors may also be at risk of unforeseen and adverse tax consequences resulting from changes to the securitization. (Biafore Aff., ¶ 8). Secured Creditor cannot take these risks.

66.    **Fifth**, Debtor has eliminated all environmental indemnity obligations under the Debtor's new Loan Documents. As written, Debtor could store hazardous waste at the Property without triggering a default or incurring any clean up obligation.

67.    To the extent the Court requires Replacement Collateral Documents, Secured Creditor respectfully submits that the only workable package of loan documents is attached as **Exhibits L through Q** in the accompanying index of exhibits in support of the Motion.

## **CONCLUSION**

68.    For the reasons set forth above, Secured Creditor respectfully requests that the

Motion be granted.

Dated:  February 12, 2020                              Respectfully submitted,

/s/ Christopher P. Schueller

West Virginia State Bar Number 11267
BUCHANAN INGERSOLL & ROONEY LLP
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219
Telephone:  (412) 562-8432
Fax:  (412) 562-1041
E-mail: christopher.schueller@bipc.com
*Attorneys for COMM 2013 CCRE12 Crossings Mall Road, LLC*

## ADDENDUM A

Section 1.1 of the Original Deed of Trust grants and conveys to Secured Lender a security interest and lien in the following property:

**Section 1.1    Property Conveyed**.  Borrower does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey and grant WITH POWER OF SALE, a security interest to Trustee for the benefit of Lender, its successors and assigns, the following property, rights, interests and estates now owned, or hereafter acquired by Borrower (collectively, the "**Property**"):

(a)    Land.  The real property described in **Exhibit A** attached hereto and made a part hereof (the "**Land**");Additional Land.  All additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land or for any other use and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Security Instrument regardless of ownership thereof (the "**Additional Land**");

(c)    Improvements,  The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land or the Additional Land (collectively, the "**Improvements**");

(d)    Easements and Other Beneficial Interests.  All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land, the Additional Land and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land or the Additional Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(e)    Equipment.  All "**equipment**," as such term is defined in Article 9 of the Uniform Commercial Code (as hereinafter defined), now owned or hereafter acquired by Borrower, which is used at or in connection with the Improvements or the Land or the Additional Land or is located thereon or therein

20

(including, but not limited to, all machinery, equipment, furnishings, and electronic data-processing and other office equipment now owned or hereafter acquired by Borrower and any and all additions, substitutions and replacements of any of the foregoing), together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto (collectively, the "**Equipment**"). Notwithstanding the foregoing, Equipment shall not include any property belonging to tenants under leases except to the extent that Borrower shall have any right or interest therein;

(f)    Fixtures. All Equipment now owned, or the ownership of which is hereafter acquired, by Borrower which is so related to the Land or the Additional Land and Improvements forming part of the Property that it is deemed fixtures or real property under the law of the particular state in which the Equipment is located, including, without limitation, all building or construction materials intended for construction, reconstruction, alteration or repair of or installation on the Property, construction equipment, appliances, machinery, plant equipment, fittings, apparatuses, fixtures and other items now or hereafter attached to, installed in or used in connection with (temporarily or permanently) any of the Improvements or the Land or the Additional Land, including, but not limited to, engines, devices for the operation of pumps, pipes, plumbing, cleaning, call and sprinkler systems, fire extinguishing apparatuses and equipment, heating, ventilating, plumbing, laundry, incinerating, electrical, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, pollution control equipment, security systems, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and water, gas, electrical, storm and sanitary sewer facilities, utility lines and equipment (whether owned individually or jointly with others, and, if owned jointly, to the extent of Borrower's interest therein) and all other utilities whether or not situated in easements, all water tanks, water supply, water power sites, fuel stations, fuel tanks, fuel supply, and all other structures, together with all accessions, appurtenances, additions, replacements, betterments and substitutions for any of the foregoing and the proceeds thereof (collectively, the "**Fixtures**"). Notwithstanding the foregoing, "**Fixtures**" shall not include any property which tenants are entitled to remove pursuant to leases except to the extent that Borrower shall have any right or interest therein;

(g)    Personal Property. All furniture, furnishings, objects of art, machinery, goods, tools, supplies, appliances, general intangibles, contract rights, accounts, accounts receivable, franchises, licenses, certificates and permits, and all other personal property of any kind or character whatsoever (as defined in and subject to the provisions of tire Uniform Commercial Code as hereinafter defined), other than Fixtures, which are now or hereafter owned by Borrower and which are located within or about the Land and the Improvements, together with all accessories, replacements and substitutions thereto or therefor and the proceeds thereof (collectively, the "**Personal Property**"), and the right, title and interest of Borrower in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted

21

and enacted by the state or states where any of the Property is located (the "**Uniform Commercial Code**"), superior in lien to the lien of this Security Instrument and all proceeds and products of the above;

(h)    Leases and Rents.  All leases and other agreements affecting the use, enjoyment or occupancy of the Land and the Improvements heretofore or hereafter entered into, whether before or after the filing by or against Borrower of any petition for relief under 11 U.S.C. §101 et seq., as the same may be amended from time to time (the "**Bankruptcy Code**") (collectively, the "**Leases**") and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, any lease guaranties, letters of credit, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, revenues, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Land and the Improvements whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code (collectively, the "**Rents**") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

(i)    Condemnation Awards.  All awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

(j)    Insurance Proceeds.  All proceeds of and any unearned premiums on any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(k)    Tax Certiorari.  All refunds, rebates or credits in connection with reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction;

(l)    Rights.  The right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(m)    Agreements.  All agreements, contracts, certificates, instruments, letters of credit, franchises, permits, licenses, plans, specifications and other documents (including without limitation the Management Agreement (as defined in the Loan Agreement)), now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or respecting

22

any business or activity conducted on the Land and any part thereof and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Borrower thereunder;

(n)     Trademarks.   All tradenames, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property;

(o)     Proceeds.   All proceeds of any of the foregoing, including, without limitation, proceeds of insurance and condemnation awards, whether cash, liquidation or other claims or otherwise; and

(p)     Other Rights.   Any and all other rights of Borrower in and to the items set forth in Subsections (a) through (o) above.

AND without limiting any of the other provisions of this Security Instrument, to the extent permitted by applicable law.  Borrower expressly grants to Lender and Trustee, as secured party, a security interest in the portion of the Property which is or may be subject to the provisions of the Uniform Commercial Code which are applicable to secured transactions; it being understood and agreed that the Improvements and Fixtures are part and parcel of the Land (the Land, the Improvements and the Fixtures collectively referred to as the "**Real Property**") appropriated to the use thereof and, whether affixed or annexed to the Real Property or not, shall for the purposes of this Security Instrument be deemed conclusively to be real estate and mortgaged hereby.

[Ex. C, §1.1].

23

### ADDENDUM B

In contrast, the collateral description in Section 1 of Debtor's New Deed of Trust is

materially different than the Original Deed of Trust and states as follows:

> 1. **GRANT AND CONVEYANCE**. For and in consideration of the Indebtedness and trusts set forth in this Deed of Trust and the sum of ten dollars ($10.00) cash in hand paid, the receipt and sufficiency of which are hereby acknowledged, Grantor does hereby GRANT and CONVEY unto Trustee, in trust with power of sale, the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easement rights of way, and appurtenances; all water, water rights and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property located in Kanawha County, West Virginia generally described as the Crossings Mall, Elkview, West Virginia, and more particularly described as follows (the "**Real Property**"):

> The real property described in **Exhibit A** attached hereto and made a part hereof.

[Ex. I, §1].

Debtor's Security Agreement supplements Debtor's Deed of Trust and provides for a lien

on:

> (i)    Equipment.  All of Debtor's right, title and interest in and to all Equipment, Fixtures and Goods, and all additions and accessions thereto, all replacements and renews of any part thereof.  The foregoing is collectively referred to as the "**Equipment and Fixtures**";

> (ii)    Accounts and Other Collateral.  All of Debtor's right, title and interest in and to all Accounts, Inventory, Chattel Paper, General Intangibles, including Payment Intangibles, Deposit Accounts, Documents, and Instruments, and all additions, accessions thereto, all replacements and renewals of any part thereof, and the Proceeds and Products of any of these items;

> (iii)    To the extent not included in the items of Collateral set forth in subsections (i) and (ii) above:

> > (a)    All attachments, accessions, accessories, tools, parts, supplies, increases, and additions to and all replacements of and substitutions for any property described above.

> > (b)    All products and produce of any of the property described in this Collateral section.

(c)  All accounts, contract rights, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, or other disposition of any of the property described in this Collateral section.

(d)  All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section.

(e)  All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm microfiche, or electronic media, together with all of Debtor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

[Ex. J, Art. II].

Nevertheless, the collateral descriptions between the Original Loan Documents and

Debtor's New Loan Documents are materially different.

## ADDENDUM C

**Comparison of Collateral under Assignment of Leases and Rents**

The Original ALR provides a broad absolute assignment of Debtor's interest in leases and rents which will be lost of the Original ALR is terminated:

**Section 1.2    Property Assigned**.    Borrower hereby absolutely and unconditionally assigns and grants to Lender the following property, rights, interests and estates, now owned, or hereafter acquired by Borrower:

(a)    Leases.    All leases, subleases or subsubleases, lettings, licenses, concessions or other agreements made a part thereof (whether written or oral and whether now or hereafter in effect), pursuant to which any Person is granted a possessory interest in, or a right to use or occupy, all or any portion of any space in that certain lot or piece of land, more particularly described in **Exhibit A** annexed hereto and made a part hereof, together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located thereon (collectively, the "**Property**") and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, and the right, title and interest of Borrower, its successors and assigns, therein and thereunder.

(b)    Other Leases and Agreements.    All other leases and other agreements, whether or not in writing, affecting the use, enjoyment or occupancy of the Property or any portion thereof now or hereafter made, whether made before or after the filing by or against Borrower of any petition for relief under 11 U.S.C. §101 et seq., as the same may be amended from time to time (the "**Bankruptcy Code**") together with any extension, renewal or replacement of the same, this assignment of other present and future leases and present and future agreements being effective without further or supplemental assignment.  The "**leases**" and the "**lease provisions**" described in Subsection 1.1(a) and the leases and other agreements described in this Subsection 1.1(b) are collectively referred to as the "**Leases**".

(c)    Rents.    All rents, rent equivalents, income, receivables, revenues, receipts, insurance proceeds, deposits and profits arising from the Leases and renewals thereof together with all rents, rent equivalents, income, fees, receivables, accounts, profits (including, but not limited to, all oil and gas or other mineral royalties and bonuses), charges for services rendered and any and all payment and consideration of whatever form or nature received by Borrower or

26

its agents or employees from any and all sources relating to the use, enjoyment and occupancy of the Property whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code (collectively, the "**Rents**").

(d)    Bankruptcy Claims.    All of Borrower's claims and rights (the "**Bankruptcy Claims**") to the payment of damages arising from any rejection by a lessee of any Lease under the Bankruptcy Code.

(e)    Lease Guaranties.    All of Borrower's right, title and interest in and claims under any and all lease guaranties, letters of credit and any other credit support (individually, a "**Lease Guaranty**", collectively, the "**Lease Guaranties**") given by any guarantor in connection with any of the Leases or leasing commissions (individually, a "**Lease Guarantor**", collectively, the "**Lease Guarantors**") to Borrower.

(f)    Proceeds.    All proceeds from the sale or other disposition of the Leases, the Rents, the Lease Guaranties and the Bankruptcy Claims.

(g)    Other.    All rights, powers, privileges, options and other benefits of Borrower as lessor under the Leases and beneficiary under the Lease Guaranties, including without limitation the immediate and continuing right to make claim for, receive, collect and receipt for all Rents payable or receivable under the Leases and all sums payable under the Lease Guaranties or pursuant thereto (and to apply the same to the payment of the Debt or the Other Obligations), and to do all other things which Borrower or any lessor is or may become entitled to do under the Leases or the Lease Guaranties.

(h)    Entry.    The right, at Lender's option, upon revocation of the license granted herein, to enter upon the Property in person, by agent or by court-appointed receiver, to collect the Rents.

(i)    Power Of Attorney.    Borrower's irrevocable power of attorney, coupled with an interest, to take any and all of tire actions set forth in Section 3.1 of this Assignment and any or all other actions designated by Lender for the proper management and preservation of the Property.

(j)    Other Rights and Agreements.    Any and all other rights of Borrower in and to the items set forth in subsections (a) through (i) above, and all amendments, modifications, replacements, renewals and substitutions thereof.

[Ex. D, §1.2].

Debtor has not proposed any equivalent interests.

4830-9255-0836, v. 1

27

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TARA RETAIL GROUP, LLC, | ) | Case No. 1:17-bk-57 |
| | ) | |
| Debtor. | ) | Honorable Patrick M. Flatley |
| | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on this 12th day of February, 2020, a copy of the Memorandum of Law was served on interested parties via the Court's electronic notification system.

Dated: February 12, 2020

**BUCHANAN INGERSOLL & ROONEY LLP**

/s/ Christopher P. Schueller
Christopher P. Schueller, Esq.
WV State Bar No. 11267
Timothy P. Palmer, Esq.
WV State Bar No. 11275
Union Trust Building
501 Grant Street, Ste. 200
Pittsburgh, PA 15219
Tel:  (412) 562-8800
christopher.schueller@bipc.com
timothy.palmer@bipc.com
*Attorneys for COMM 2013 CCRE12 Crossings Mall Road, LLC*

1